**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

Steamboat Ventures, Ltd., et al., :
:
        Plaintiffs, :
:
  v. : CIVIL ACTION NO.
: 1:09-cv-01399-JOF
Federal Deposit Insurance Corporation, :
:
        Defendant. :
:

## OPINION & ORDER

Plaintiffs, Steamboat Ventures, Ltd; Village Commercial Group, LLC; and Prime Pacific Capital, LLC, filed suit against Defendant Federal Deposit Insurance Corporation as Receiver for Integrity Bank ("FDIC-R"), seeking to enjoin the FDIC-R from initiating any foreclosure proceedings against the property and improvements known as Highmark Condominium Project and to recover from Defendant all losses, costs, injuries, and damages they have suffered as a result of Defendant's breach of contract. Stuart Market Project, LLC intervened in the action as a third-party Plaintiff-in-Intervention asserting claims against Defendant and Plaintiff, Steamboat Ventures. The FDIC-R has counterclaimed against Steamboat Ventures for breach of contract related to Steamboat Ventures's alleged default on the underlying loan documents.

On October 19, 2009, the FDIC-R informed Stuart Market that it intended to foreclose on the Highmark Condominium Project property by October 31, 2009. Shortly thereafter, Steamboat Ventures and Stuart Market filed a joint motion to stay foreclosure proceedings. On October 28, 2009, the court granted a temporary stay and set a hearing date. The parties appeared before the court on November 6, 2009. At the hearing, the FDIC-R argued that under 12 U.S.C. § 1821(j), the court did not have jurisdiction to bar the foreclosure proceedings because the FDIC-R had stepped into the shoes of Integrity Bank's security interest in the Commercial Unit of the Highmark Condominium Project. Stuart Market responded that based on the numerous financing agreements made among the parties, once Steamboat Ventures had paid the balance of its loan from Integrity down below $10,000,000, by operation of law, Integrity Bank's security interest in the Commercial Unit was released. Stuart Market asserted that the pay down occurred *prior* to the FDIC's takeover of Integrity Bank. Therefore, Stuart Market concluded, the FDIC-R does not now – and never did – have a security interest in the Commercial Unit rendering 28 U.S.C. § 1821(j) inapplicable to the instant litigation. At the conclusion of the hearing, the court ordered additional briefing.

**Background**

The parties do not appear to contest the basic facts and the court recounts them here to provide context. Steamboat Ventures purchased a piece of property in Steamboat Springs,

Colorado to develop and construct a luxury condominium complex containing both Residential Units and a Commercial Unit. Steamboat Ventures received the property on November 28, 2000, in an agreement with Stuart Market, the owner of the property. As part of the agreement, Steamboat Ventures agreed to convey to Stuart Market the Commercial Unit when completed. On May 3, 2002, Steamboat Springs and Stuart Market entered into another series of agreements concerning the property. Under the terms of these agreements, Stuart Market would acquire the fully constructed Commercial Unit from Steamboat Ventures in exchange for certain obligations owed by Steamboat Ventures. The same day, Steamboat Ventures delivered to Stuart Market a Non-Recourse Promissory Note which was to be paid to Stuart Market if Steamboat Ventures defaulted on its obligation to deliver the Commercial Unit. The Note was secured by a Deed of Trust on the Property/Project.

On October 31, 2005, Steamboat Ventures borrowed $20 million from Integrity Bank for development and construction. As originally executed, the Loan matured on April 30, 2007, but the maturity date was later extended to October 2007. The loan was secured by a first lien on the property and improvements. The same day, Steamboat Ventures secured a loan from Prime Pacific for $8 million secured by a second lien on the property. As part of this financing, Integrity Bank, Prime Pacific, and Stuart Market entered into the Intercreditor Agreement through which the rights of Prime Pacific and Stuart Market were subordinated to Integrity Bank. Stuart Market and Prime Pacific entered into a separate

3

Limited Subordination Agreement whereby the rights of Stuart Market were subordinated to Prime Pacific and Prime Pacific agreed that if it were to exercise its foreclosure rights, it would deliver the Commercial Unit to Stuart Market free and clear of all liens and encumbrances.

Steamboat Ventures was to use the loan to construct the Project, including Residential and Commercial Units. Steamboat Ventures would market and sell the Residential Units. Integrity Bank was to release its lien on each Residential Unit at closing upon payment of an agreed upon Release Fee for each Residential Unit. The Release Fee would then be applied to payments on the loan.

On February 11, 2008, Integrity Bank was placed under a cease and desist order by the FDIC. By August 29, 2008, Steamboat Ventures delivered over $10.9 million in principal payments under the Loan Agreement rendering the remaining balance less than $10 million. On August 29, 2008, the FDIC announced that Integrity Bank had been shut down and the FDIC had taken over as receiver.

According to Plaintiffs, on August 29, 2008, the Escrow Agent received funds for the sale of a Residential Unit for $1.77 million. Prior to submitting the funds to escrow, the Escrow Agent and Steamboat Ventures spoke with representatives of Defendant who promised that the lien on the Commercial Unit, as well as the lien on this particular Residential Unit would be released upon receipt of the funds. In reliance on this promise,

4

AO 72A
(Rev.8/82)

the Escrow Agent recorded Stuart Market's and Prime Pacific's releases of the Residential Unit and sent the funds from the Unit to Defendant. Defendant retained the funds but did not at that time release its lien on the Commercial Unit or the Residential Unit. Because the lien on the Commercial Unit has not been released, Steamboat Ventures has not been able to deliver clear title to the Commercial Unit, and Stuart Market and Village Commercial have not been able to complete their agreement and transfer the rights to the Commercial Unit. Steamboat Ventures further asserts that it has not been able to pay off the Loan because Defendant has refused to release Residential Units. According to Defendant, Steamboat Ventures is in default on the Loan for failure to pay the principal, interest, and other amounts due at maturity on July 31, 2008.

**Bar Against Judicial Restraints**

The FDIC-R is correct that the reach of 12 U.S.C. § 1821(j) is broad. The statute provides:

> Except as provided in this section, no court may take any action, except at the request of the Board of Directors by regulation or order, to restrain or affect the exercise of the powers or functions of the Corporation as a conservator or receiver.

12 U.S.C. § 1821(j). This section is known as the "bar against judicial restraints" and has been described as "drastic" and "effect[ing] a sweeping ouster of courts' power to grant equitable remedies." *See Freeman v. FDIC*, 56 F.3d 1394, 1398, 1399 (D.C. Cir. 1995). The FDIC's "broad powers as receiver include the power to foreclose on the property of a

5

debtor held by the failed bank as collateral, and no court may enjoin the exercise of that power." *Id.* at 1399. "Not only does [§ 1821(j)] bar injunctive relief, but . . . where appellants seek a declaratory judgment that would effectively 'restrain' the FDIC from foreclosing on their property, § 1821(j) deprives the court of power to grant that remedy as well." *Id.*

Thus, if the court determines that as of the close of business on August 29, 2008, Integrity Bank had a security interest in the Commercial Unit, then the FDIC-R stepped in to the shoes of that interest and the court has no jurisdiction to bar any foreclosure proceedings initiated by the FDIC-R. If, however, the court determines that Integrity Bank had no interest in the Commercial Unit at the close of business on August 29, 2008, then the FDIC-R thereby would also have no interest in the Commercial Unit and 12 U.S.C. § 1821(j) would not apply.

To determine the status of the security interest on the Commercial Unit as of August 29, 2008, the court must more closely consider certain of the financing agreements signed among the parties. On October 31, 2005, Integrity Bank and Steamboat Ventures entered into a Loan Agreement which contained certain "Release Provision" stating *inter alia* that Integrity agreed "provided that no Default or Event of Default shall exist as defined herein or in any Loan Document associated with this transaction," to release any liens on units sold

6

at the time of closing. *See* Loan Agreement, ¶ 10.03.[1] The same day, Integrity Bank and Steamboat Ventures also signed a Deed of Trust and Security Agreement which itself recited similar Release Provisions. *See* Security Agreement, ¶ 10.21.

On October 30, 2007, Integrity Bank and Steamboat Ventures entered into the Second Modification of the Loan and Promissory Note. Among other items, the Second Modification provided that:

> The Loan Agreement is further revised to provide that with respect to that certain commercial condominium unit known as Unit 1A, that Payee shall release same from the lien of the Deed of Trust as such time as the outstanding principal balance of the Loan and Note has been reduced below $10,000,000, provided that the other terms for release of units set forth in the Loan Agreement are met.

*See* Second Modification, ¶ 3. The same day, the parties also made the Second Modification of the Deed of Trust and Security Agreement. "The Collateral Deed is further revised to provide that with respect to that certain commercial condominium unit known as Unit 1A, that same shall be released from the lien of the Collateral Deed at such time as the outstanding principal balance of the Note has been reduced below $10,000,000, provided that the other terms for release of the units set forth in the Collateral Deed and any other Loan Documents are met." *Id.*, ¶ 2.

---

[1] The provision also includes other elements such as "Release Fees" which are not at issue here.

On December 17, 2007, Integrity Bank sent a "Letter Agreement" to Steamboat Ventures reciting only the following:

> This letter shall serve to confirm that the current balance of the principal due under the above referenced loan is $20,000,000, and that Integrity Bank agrees to release its security interest in the commercial unit (Unit 1A) once the principal due under the loan is reduced to $10,000,000 or less.

*Id.* On February 28, 2008, the parties signed the Third Modification of the Loan and Promissory Note. This modification extended the maturity date of the Loan to July 31, 2008. *Id.*, ¶ 1. It also provided that "Each of Maker and Guarantors hereby (I) ratifies and affirms all of its/his/her obligations under the Note and Loan Documents as modified and amended hereby and the Guaranty Agreements, respectively." *Id.*, ¶ 3.

On May 2, 2008, Stuart Market, Steamboat Ventures, Prime Pacific Capital, and Jane Denning entered into a Joint Escrow Instructions and Amendment Agreement. (Integrity Bank was not initially part of this Joint Escrow Instructions Agreement.) The Joint Escrow Instructions provided that:

> [Steamboat] Ventures has substantially completed the Commercial Unit in accordance with the Contract except for certain finish work and is prepared to convey title to [Stuart] Market, provided that it can obtain the release of the Integrity and [Prime Pacific]'s deeds of trust. [Prime Pacific] has informed [Steamboat] Ventures that it is prepared to release (without the payment of additional consideration) its deed of trust as to the Commercial Unit and is entering into these Instructions for that purpose. Integrity has informed [Steamboat] Ventures that it is willing to release (without the payment of additional consideration) the Commercial Unit from the Integrity deed of trust if the unpaid principal balance of its loan is paid down to $10,000,000 or less.

> Integrity's agreement for this partial release of the Commercial Unit is memorialized by letter attached to these Instructions as Exhibit A.

*Id.*, Recital d (Exhibit A is the December 17, 2007, Letter Agreement discussed above). On July 25, 2008, Integrity Bank signed a statement consenting to the Joint Escrow Instructions. Integrity's consent was signed six days before the date of maturity of Integrity's $20,000,000 loan to Steamboat Ventures. There is no dispute that Steamboat Ventures was in default on the loan after July 31, 2008.

The next relevant date in the chronology is August 29, 2008. Around this time, the sale of the Commercial Unit 1A and one residential unit 6C were about to close. The Escrow Agent was working with Integrity Bank to get the lien releases signed for these properties. *See* August 21, 2008, e-mail from Escrow Officer to Integrity Bank (requesting releases from Integrity Bank). The morning of August 29, 2008, a representative of Integrity Bank asked the Escrow Officer whether the funding for the residential unit was happening that day and whether the bank would be receiving a wire transfer of funds. *See* August 29, 2008, e-mail at 10:03 a.m. The Escrow Agent informed Integrity Bank that the funding would be going through and that the bank would receive a wire. *See* August 29, 2008, e-mail at 1:27 p.m. Integrity Bank responded to the Escrow Agent: "Wire received – releases for 6C and 1A will be released and sent to you." *See* August 29, 2008, e-mail at 1:36 p.m. The FDIC took over Integrity Bank at close of business on August 29, 2008, and Integrity Bank had not conveyed the releases on Commercial Unit 1A and Residential Unit 6C.

9

Based on this chronology and the agreements signed by the parties, the FDIC-R argues that there were two conditions precedent to Integrity releasing its security interest in the Commercial Unit: (1) receipt of funds bringing the principal balance of the Loan below $10,000,000 and (2) that the Loan itself not be in default. Steamboat Ventures and Stuart Market respond that even if these two conditions precedent existed at some point, as of December 19, 2007, Integrity had dropped the second requirement that the Loan not be in default and had agreed to release its security interests in units as sold so long as the remaining principal on the Loan had dropped below $10,000,000.

The court agrees with the FDIC-R that the Loan Agreement, Security Agreement, and the October 30, 2007, Second Modifications of both those documents clearly retain the two conditions precedent. But the documentary chain does not end on October 30, 2007. Rather, on December 19, 2007, Integrity Bank issued a Letter Agreement in which Integrity "confirms" the current balance of the Loan at $20,000,000 and "agrees" to "release its security interest" in the Commercial Unit once the principal due is reduced to $10,000,000 or less. The court agrees with FDIC-R that the Letter Agreement lacks a certain formality or mutuality contained in the prior agreements. The court might not go so far as to say the letter "was not intended as a modification, but merely as a one sentence recitation of the gist of the Loan Documents," *see* FDIC-R Supplemental Response, at 5 n.5, but the Letter Agreement is not a document similar to those preceding it.

10

The significance of the Letter Agreement is further clouded by the February 28, 2008, Third Modification of Loan and Promissory Note made between Steamboat Ventures and Integrity Bank. That document extends the maturity date of the Loan to July 31, 2008, and more significantly has at least Steamboat Ventures and its Guarantors ratify and affirm their obligations under the Note and Loan Agreements as modified and amended. There is no specific discussion in the Third Modification as to whether the conditions for release had changed.

As Stuart Market argues, however, it is possible that the December 19, 2007, Letter Agreement would constitute "Loan Documents" as defined as "the Note and all documents evidencing and securing the same" such that the Letter Agreement could modify the terms. Further, the February 28, 2008, Third Modification only addresses Steamboat Ventures and the Guarantors, leaving open the possibility that the Bank's obligations as described in the December 19, 2007, Letter Agreement carried through the Third Modification. The court need not resolve this issue, however, because it is clear that the May 2, 2008, Joint Escrow Instructions and Amendment (as described below) unambiguously evidences an agreement among the parties to make a change in the conditions precedent to the releases.

In considering the logic of the chronology, none of this is particularly surprising. Steamboat Ventures had difficulty meeting the obligations of the Loan throughout the project. The maturity date had been extended repeatedly. The final maturity date of July

11

31, 2008, was rapidly approaching at the beginning of May when the parties agreed to the new Joint Escrow Instructions. It is certainly conceivable that the parties at the very least had serious concerns about the ability of Steamboat Ventures to meet this new maturity date. The only way for Steamboat Ventures to produce money was to sell the units it had built, which required cooperation from all involved to release security interests. Faced with this new economic reality, the parties apparently agreed to a change in the agreement on the terms of release of the residential and commercial units.

> The Joint Escrow Instructions clearly sets forth this "new reality" when it recites that:
>
> [Steamboat] Ventures has substantially completed the Commercial Unit in accordance with the Contract except for certain finish work and is prepared to convey title to [Stuart] Market, provided that it can obtain the release of the Integrity and [Prime Pacific]'s deeds of trust. [Prime Pacific] has informed [Steamboat] Ventures that it is prepared to release (without the payment of additional consideration) its deed of trust as to the Commercial Unit and is entering into these Instructions for that purpose. Integrity has informed [Steamboat] Ventures that it is willing to release (without the payment of additional consideration) the Commercial Unit from the Integrity deed of trust if the unpaid principal balance of its loan is paid down to $10,000,000 or less. Integrity's agreement for this partial release of the Commercial Unit is memorialized by letter attached to these Instructions as Exhibit A.

*Id.*, Recital d (Exhibit A is the December 17, 2007, Letter Agreement). Recital d clearly and unambiguously shows that the parties all agreed to modify the terms of release. The Joint Escrow Instructions also specifically incorporate the December 17, 2007, Letter Agreement and provide it with the formality and context that it may have lacked standing alone.

12

Although the original Joint Escrow Instructions did not include Integrity Bank as a party, the Instructions note that:

> the parties acknowledge that this document requires the consent of Integrity Bank pursuant to the Subordination and Intercreditor Agreement dated as of October 31, 2005, and the parties acknowledge that this document shall be one of the Stuart Market Loan Documents as defined in the Subordination and Intercreditor Agreement and shall be subject in all respects to the terms and conditions of the Subordination and Intercreditor Agreement. If Integrity Bank declines to give its consent to this document, then [Steamboat] Ventures shall promptly notify the parties of this fact, this document shall be void *ab initio*, the Escrow Agent shall return the Release to [Prime Pacific], the Escrow Agent shall return the Finish Deposit to [Steamboat] Ventures, [Steamboat] Ventures shall pay the Escrow Agent any fee charged for its services, and all parties shall be released from any further liability under this document.

*See* Joint Escrow Instructions, ¶ 4. The fact that the parties recognized in the Joint Escrow Instructions Agreement that the consent of Integrity Bank was necessary again clearly demonstrates that the parties were changing the terms of the contract and understood the significance of that. And, in fact, Integrity Bank did consent to the Joint Escrow Instructions on July 25, 2008, just days before Steamboat Ventures went into default on the Loan. The fact that Integrity Bank consented to the new Joint Escrow Instructions without requiring the condition of no default on the Loan just days before the maturity date is clear indication that the condition precedent of "no default" had been dropped in the face of the economic realities of the project. The court can imagine the reasons Integrity Bank consented to the new release terms, but it need not even speculate. The clear terms of the parties' new

13

agreement unambiguously drops the "no default" condition precedent. Instead, the release of liens is keyed entirely off of the remaining amount of principal.

No party disputes that Steamboat Ventures paid the principal down below $10,000,000 on August 29, 2008, when Integrity Bank received funds for the sale of a residential unit. Thus, under the terms of the parties' agreement as memorialized in the Joint Escrow Instructions and Integrity Bank's consent thereto, Integrity Bank was obligated as of August 29, 2008, when the funds for the residential unit were wired, to release its interest in the Commercial Unit. However, before Integrity Bank provided the release it was legally obligated to produce, the FDIC-R took over the Bank and refused to provide the release.

Finally, the actions of Integrity Bank demonstrate that it contemporaneously understood the change in the terms of release. The e-mail exchange between the Escrow Agent and Integrity Bank shows that Integrity stated it would release the lien on the Commercial Unit as of 1:36 p.m. on August 29, 2008, after the Bank had received the funds for the sale of the residential unit. Moreover, even after the takeover, the FDIC-R did provide a formal release of the Bank's lien on Residential Unit 6C without any contention that the "no default condition" had been satisfied. The FDIC-R has not pointed the court to any contractual provision which would support treating the residential unit in a different manner than the commercial unit.

AO 72A
(Rev.8/82)

Thus, the court concludes that under the terms of the agreements signed by the parties, specifically culminating in the Joint Escrow Instructions, Integrity Bank was obligated to release its lien on the Commercial Unit when the remaining principal balance on the loan dropped below $10,000,000, which it undisputably did before close of business on August 29, 2008. Integrity Bank's obligation to release its lien occurred ***prior*** to the FDIC's take over of the Bank after close of business on August 29, 2008. Once the condition precedent of payment on the Loan down below $10,000,000 was met, then the Bank's interest was extinguished as a matter of law. *See Hohn v. Morrison*, 870 P.2d 513 (Colo. App. 1993). Therefore, the court finds that because the Bank had no security interest or lien in the property at the time of the takeover, the FDIC-R has no interest or lien in the Commercial Unit. Clear title of the Commercial Unit may pass to Stuart Market. As a result, 12 U.S.C. § 1821(j) is inapplicable to the action.

This determination, however, does not end the litigation before the court. Plaintiffs filed suit not only to resolve the status of the Commercial Unit, but also to recover from Defendant damages they have allegedly suffered as a result of Defendant's breach of contract. The court's instant order resolves the issue of which entities currently have an interest in the property, but does not address any potential liability or damages for a breach of contract claim against the FDIC-R.

15

Plaintiffs also allege a count of fraud in their complaint based on the alleged failure of Defendant to adhere to the promises made on August 29, 2008. Stuart Market raises the same claims against Defendant as do Plaintiffs. Stuart Market's Intervenor Complaint also raises a cause of action of breach of contract against Steamboat Ventures for failure to convey clear title to the Commercial Unit. Again, the court's order only establishes that the FDIC-R does not now and never did have any security interest or lien in the Commercial Unit.

FDIC-R answered Plaintiffs' complaint on July 28, 2009, and filed a counterclaim against Steamboat Ventures for breach of promissory note for failure to pay on the Loan, or in the alternative *quantum meruit*/unjust enrichment. The court's order has not addressed Steamboat Ventures's failure to pay on the Loan.

Although the court has resolved the practically significant issue of whether the FDIC-R has any lien rights to the Commercial Unit, it is clear that many legal issues remain in the complaint and counterclaim. Therefore, the court DIRECTS the parties to file motions for summary judgment on the remaining claims by February 1, 2010.

**IT IS SO ORDERED** this 8th day of December 2009.

    /s   J. Owen Forrester
    J. OWEN FORRESTER
SENIOR UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)